

**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

---

*Connecticut Financial Center*        *(203) 821-3700*
*157 Church Street, 25th Floor*        *Fax (203) 773-5376*
*New Haven, Connecticut 06510*         *www.justice.gov/usao/ct*

December 21, 2021

David T. Grudberg, Esq.
Carmody Torrance Sandak Hennessey LLP
195 Church Street
New Haven, CT 06510

United States District Court
District of Connecticut
FILED AT   BRIDGEPORT
12/21/2021 20
Robin D. Tabora, Clerk
By _____
Deputy Clerk

    Re:    **United States v. Marmon Utility LLC**
             **Case No. 3:21CR 223 (KAD)**

Dear Atty. Grudberg:

    This letter confirms the plea agreement between your client, Marmon Utility LLC (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") in this criminal matter.

## THE PLEA AND OFFENSE

    In consideration for the benefits offered under this agreement, the defendant agrees to waive its right to be indicted and to plead guilty to a one-count information charging a violation of 33 U.S.C. § 1319(c)(2)(A)—that is, knowingly violating, or causing a violation of, the requirements imposed in a pretreatment program approved under the Clean Water Act by failing to properly operate and maintain its industrial wastewater treatment system.

    The defendant understands that, to be guilty of this offense, the following essential elements must be satisfied:

1.    That on every day from at least April 24, 2016, to September 29, 2016, the defendant violated, or caused a violation of, a requirement imposed in a pretreatment program approved pursuant to 33 U.S.C. § 1342—that is, the defendant failed to properly operate and maintain the facilities and systems for industrial wastewater collection, storage, treatment, and control at the Kerite Power Cable & Pump Cable factory located at 49 Day Street in Seymour, Connecticut, and

2.    The defendant acted knowingly.

David T. Grudberg, Esq.
December 21, 2021
Page 2

## THE PENALTIES

### Probation

The maximum term of probation is five years.  18 U.S.C. § 3561(c)(1).

### Fine

This offense carries a maximum fine of not less than $5,000 nor more than $50,000 per day of violation.  33 U.S.C. § 1319(c)(2)(A) and 18 U.S.C. § 3571(c)(1).  The defendant is also subject to the alternative fine provision of 18 U.S.C. § 3571.  Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense; (2) twice the gross loss resulting from the offense; (3) $500,000; or (4) the amount specified in the section defining the offense, which is not less than $5,000 nor more than $50,000 per day of violation pursuant to 33 U.S.C. § 1319(c)(2)(A).

### Special Assessment

In addition, the defendant is obligated by 18 U.S.C. § 3013(a)(2)(B) to pay a special assessment of $400 on each count of conviction.  The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty plea is accepted.

### Restitution

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution under 18 U.S.C. § 3663A, and the Government reserves its right to seek restitution on behalf of victims consistent with the provisions of § 3663A.  The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless otherwise ordered by the Court.

Regardless of restitution that may be ordered by the Court noted above, the defendant agrees to make restitution in the amount of $7,538 to Veolia North America, the operator of the municipal wastewater treatment facility in Seymour, Connecticut.  The defendant agrees to make such restitution by the sentencing date in this case.

### Interest, penalties and fines

Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date.  18 U.S.C. § 3612(f).  Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572(h), (i) and § 3612(g).

David T. Grudberg, Esq.
December 21, 2021
Page 3

## **THE SENTENCING GUIDELINES**

### Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case. The defendant agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office.

### Application of the Sentencing Guidelines

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

The parties agree that the applicable Sentencing Guidelines are found in U.S.S.G., Chapter 8. In following the application instructions outlined in U.S.S.G. § 8A1.2, the parties agree that in this case involving environmental crimes, any criminal fine is governed by the generalized sentencing considerations outlined in U.S.S.G. § 8C2.10.

### Plea Agreement Pursuant to Rule 11(c)(1)(C)

The defendant and the Government agree, pursuant to Fed. R. Crim. P. 11(c)(1)(C), that the following sentence is a reasonable and appropriate disposition of this case. Both parties agree that this sentence is sufficient, but not greater than necessary, to achieve the purposes of sentencing in light of the factors set forth under 18 U.S.C. § 3553(a):

(1) the defendant shall pay a criminal fine of $800,000 payable to the Clerk of the Court within 30 days of sentencing;

(2) the defendant shall be placed on probation for a period of three years from the date of sentencing, during which time the defendant shall comply with the Special Conditions of Probation set forth in Appendix A of this Plea Agreement, which shall become part of the Court's Judgment; and

(3) on or before the date of sentencing, the defendant shall make a $1.6 million community service payment to the Connecticut Statewide Supplemental Environmental Project ("SEP") Account (Naugatuck River Enhancement), managed by the Connecticut Department of Energy and Environmental Protection ("CT DEEP"). This payment shall be used to fund aquatic ecosystem enhancement projects in the Naugatuck River Basin as selected by CT DEEP consistent with its February 15, 1996, *Policy on Supplemental Environmental Projects*, and in accordance with its *Environmental Equity Policy*, including, but not limited to, river restoration, water quality improvement, dam removal, fish habitat enhancement, sediment removal, and stream bank stabilization.

David T. Grudberg, Esq.
December 21, 2021
Page 4

The defendant shall not claim, for any tax purpose, that the $1.6 million payment made to the Connecticut Statewide SEP Account constitutes a deductible expense or an offset to the defendant's income tax liability. Nor shall the defendant characterize, publicize, or refer to this payment as a voluntary donation or contribution.

The parties further agree that CT DEEP shall have exclusive control over the selection, design, and completion of any projects that may be funded in whole or in part by the defendant's payment. Neither the defendant nor the Government has any rights, interests, or obligations concerning those projects, or any of the facilities, products and systems that may result from those funded projects.

The payment shall be mailed or personally delivered to the Department of Energy and Environmental Protection, Bureau of Central Services, Accounts Receivable Office, 79 Elm Street, Hartford, Connecticut 06106-5127, and shall be made by certified or bank check payable to the "Treasurer, State of Connecticut," with a notation stating "Statewide SEP Account, Naugatuck River Enhancement" and listing the federal docket number for the instant criminal case.

In accordance with Fed. R. Crim. P. 11(c)(1)(C), if the Court accepts this plea agreement, the Court must include the agreed-upon disposition in the judgment. Pursuant to Fed. R. Crim. P. 11(c)(5), if the Court rejects this plea agreement or the agreed-upon sentencing stipulation, the defendant shall be afforded the opportunity to withdraw its guilty plea. The defendant understands that it has no right to withdraw its guilty plea as long as the Court imposes a sentence consistent with the terms of the stipulated sentence. The defendant further understands that if the Court rejects the plea agreement or the agreed-upon sentencing stipulation, the Government may deem this plea agreement null and void.

<u>Corporate Authorization</u>

The defendant agrees that it will designate a duly authorized representative of the defendant to appear on behalf of the defendant to waive indictment, to enter a plea of guilty, and to receive on behalf of the defendant the imposition of the sentence by the Court.

<u>Stipulation</u>

Pursuant to § 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into the attached stipulation, which is a part of this plea agreement. The defendant understands that this stipulation does not set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

David T. Grudberg, Esq.
December 21, 2021
Page 5

<u>Information to the Court</u>

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case, which is the sentence described above. Moreover, the Government and the defendant will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

## **WAIVER OF RIGHTS**

The defendant acknowledges and agrees that it is knowingly, intelligently, and voluntarily waiving the following rights:

<u>Waiver of Right to Indictment</u>

The defendant understands that it has the right to have the facts of this case presented to a federal grand jury, consisting of between sixteen and twenty-three citizens, twelve of whom would have to find probable cause to believe that he committed the offense set forth in the information before an indictment could be returned. The defendant acknowledges that it is waiving its right to be indicted.

<u>Waiver of Trial Rights and Consequences of Guilty Plea</u>

The defendant understands that it has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent it.

The defendant understands that it has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against it, the right to testify and present evidence, and the right to compel the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty it waives those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if it pleads guilty, the Court may ask it, through its representatives, questions about each offense to which it pleads guilty, and if it answers those questions falsely under oath, on the record, and in the presence of counsel, its answers may later be used against it in a prosecution for perjury or making false statements.

<u>Waiver of Statute of Limitations</u>

The defendant stipulates that it has executed knowingly and voluntarily two separate agreements tolling the statute of limitations with the Government while seeking to resolve this criminal matter and negotiating the instant plea agreement. The defendant further agrees that, should the conviction following defendant's guilty plea be vacated for any reason, then any

David T. Grudberg, Esq.
December 21, 2021
Page 6

prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that it is entering into this agreement and is pleading guilty freely and voluntarily because it is guilty. The defendant further acknowledges that it is entering into this agreement without reliance upon any discussions between the Government and it (other than those set forth in this plea agreement letter), without promise of benefit of any kind (other than the agreed-upon disposition pursuant to Fed. R. Crim. 11(c)(1)(C) set forth above in this plea agreement letter), and without threats, force, intimidation, or coercion of any kind.

The defendant further acknowledges its understanding of the nature of the offense to which it is pleading guilty, including the penalties provided by law. The defendant also acknowledges its complete satisfaction with the representation and advice received from its undersigned attorney. The defendant and its undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to it with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving it.

## COLLATERAL CONSEQUENCES

The defendant understands that it will be adjudicated guilty of each offense to which it has pleaded guilty and may be deprived of certain rights. The defendant understands that the Government reserves the right to notify any state or federal agency by which it is licensed, or with which it does business.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut, for any criminal charges under the Clean Water Act, 33 U.S.C. § 1251 et seq., for the defendant's failure to properly operate and maintain

*David T. Grudberg, Esq.*
*December 21, 2021*
*Page 7*

the industrial wastewater treatment system and sludge-processing equipment at the Kerite Power Cable & Pump Cable factory at 49 Day Street in Seymour, Connecticut, from at least April 24, 2016, up to and including September 29, 2016.

  The defendant understands that if, before sentencing, it violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement.  If the agreement is voided in whole or in part, the defendant will not be permitted to withdraw his guilty plea.

## **NO OTHER PROMISES**

  The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

David T. Grudberg, Esq.
December 21, 2021
Page 8

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

LEONARD C BOYLE
ACTING UNITED STATES ATTORNEY

HAROLD H. CHEN
ASSISTANT UNITED STATES ATTORNEY

The defendant certifies that Marmon Utility LLC, and I on its behalf are authorized to enter into this agreement in accordance with the attached authorization. I have read this plea agreement letter and its attachment(s) and have had ample time to discuss this agreement and its attachment(s) with counsel and fully understand and accept its terms.

RANDY CLOS                                    Date  12/21/21
Vice President of Finance
Marmon Utility LLC

I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to a duly authorized representative of the defendant who advises me that he understands and accepts its terms.

DAVID T. GRUDBERG, ESQ.                     Date  12/21/21
Attorney for the Defendant

David T. Grudberg, Esq.
December 21, 2021
Page 9

## STIPULATION OF OFFENSE CONDUCT AND RELEVANT CONDUCT

The defendant, Marmon Utility LLC, and the Government stipulate to the following offense conduct and relevant conduct that give rise to the defendant's agreement to plead guilty to the information:

Marmon Utility LLC ("Marmon"), owns Kerite Power Cable & Pump Cable ("Kerite"), which operates a factory located at 49 Day Street in Seymour, Connecticut. Marmon is owned by Marmon Group, a holding company that purchased Kerite in 1999. Marmon Group is owned by Berkshire Hathaway.

At its Kerite factory in Seymour, Marmon manufactures large rubber-insulated power cable used for, among other industrial purposes, the transmission of high-voltage electricity in harsh marine environments across long distances. To make the cable, rubber compounds are extruded over metal wires, thereby forming insulated layers around the metal to protect them from the elements. This manufacturing process generates industrial wastewater containing heavy metals such as lead, zinc, and copper.

Under the Clean Water Act ("CWA") and related federal and state regulations, a manufacturing company in Connecticut must have a permit from the Connecticut Department of Energy and Environmental Protection ("CT DEEP") to lawfully discharge industrial wastewater to a municipal sewage treatment plant, which is also known as the Publicly Owned Treatment Works ("POTW"). This requirement exists because a sewage treatment plant is primarily designed to treat human biological waste—not the pollutants or chemicals present in industrial wastewater. Moreover, the water exiting a treatment plant is ultimately discharged to rivers, lakes, and the sea.

Consequently, CT DEEP permits regulate the amount of industrial wastewater discharged to the sewage treatment plant and require manufacturing companies to "pretreat" their industrial wastewater at the factory to remove heavy metals, such as lead and zinc. Such permits also prohibit bypassing any portion of the treatment system, and require companies to properly operate and maintain the system, in addition to imposing limits on the amounts of heavy metals that can be sent to the sewage treatment plant.

The Town of Seymour's municipal sewage treatment plant is located at 723 Derby Avenue Extension and has its own CT DEEP permit to treat and discharge wastewater. For all times relevant to this case, a company named Veolia Water North America operated Seymour's sewage treatment plant. After the sewage is processed, the plant discharges the treated wastewater to the Naugatuck River, which merges with the Housatonic River in Derby, Connecticut, which flows south and empties into the Long Island Sound. The Seymour Water Pollution Control Authority oversees the plant.

Under its CT DEEP permit issued on April 29, 2015, Marmon was required to properly operate and maintain the industrial wastewater treatment system at its Kerite factory, including

David T. Grudberg, Esq.
December 21, 2021
Page 10

pretreating the industrial wastewater; reducing the levels of heavy metals, primarily lead and zinc, before discharge; and prohibiting bypasses of any portion of the treatment system. In its most basic terms, Marmon's pretreatment system runs its industrial wastewater through a series of tanks and pipes to remove heavy metals by chemical precipitation. The pretreatment process begins in a 7,500-gallon storage tank, which pipes the wastewater to a 6,000-gallon batch-treatment tank. At specific times, an operator must add chemicals to this batch treatment tank which, at the proper pH levels, will precipitate the metals out of the wastewater and generate a metals-bearing sludge sinking to the tank's bottom. An operator transfers the sludge through a pipe to a 3,000-gallon holding/thickening tank, where it thickens and is transferred to a filter press to remove the remaining moisture. An operator then discharges the treated industrial wastewater to a 300-gallon holding/discharge tank where it is sent through bag filters to capture any remaining solids. From this point, the industrial wastewater has completed the pretreatment process and can be discharged safely to the sewage treatment plant. An operator has to transfer the metals-bearing sludge into chemical storage drums, which are trucked offsite by a licensed waste disposal service.

On September 7 and 8, 2016, the Veolia superintendent of the Seymour treatment plant observed unusual, rusty brown wastewater flowing into the plant and notified CT DEEP. This rusty brown influent was interfering with the decomposition of the sewage at the plant. The Veolia superintendent took samples of the rusty brown influent and determined that its lead concentration was approximately 127 times greater than the plant's normal lead measurement (1.79 mg vs. .014 mg), and that its zinc concentration was over 10 times the typical zinc concentration (1.69 mg vs. .163 mg). As a result, during the next several days, Veolia had to order several truckloads of biologic microorganisms to break down the unprocessed sewage. It took two weeks for the treatment plant to return to usual operational capacity. Based on the sampling performed by Seymour treatment plant, the plant reported that it did not exceed the limits in its discharge permit.

On September 27 and 29, 2016, CT DEEP and Veolia inspected Marmon's Kerite facility and concluded that it had discharged the rusty brown influent with the high lead and zinc concentrations on September 7, 8, and 9, 2016. CT DEEP issued a Notice of Violation to Marmon. The evidence included the following:

- The Marmon facility manager at the Kerite factory stated, among other things: (1) that the wastewater treatment operator had not been at the facility since the end of March 2016 due to medical reasons; (2) that no sludge had been processed in the filter press since this employee's departure; and (3) no other Marmon employee had been trained to process sludge as required under the CT DEEP permit.

- The Kerite factory had discharged 5,725 gallons of industrial wastewater on September 7, 2016, and 5,225 gallons on September 8, 2016. These discharge amounts exceeded the 4,900 maximum daily discharge limit in Marmon's CT DEEP permit.

*David T. Grudberg, Esq.*
*December 21, 2021*
*Page 11*

- The batch-treatment tank, the sludge-holding tank, and the final discharge tank all contained substantial amounts of sludge. The water in the final discharge tank, which should not contain sludge, flows to the Seymour sewage treatment plant.

- The lead concentration in water samples taken from the final discharge tank was 69 times greater than the limits of Marmon's CT DEEP permit (20.7 mg/l vs. limit of .3 mg/l). The zinc concentration in water samples taken from the final discharge tank was 8.5 times greater than the limits of Marmon's CT DEEP permit (17.1 mg/l vs. limit of 2.0 mg/l).

The Government's investigation of Marmon further disclosed the following facts, among others:

- Beginning in 1989, the Kerite factory had employed a Facilities and Environmental Manager with an environmental compliance background to operate the wastewater treatment system and the sludge filter press. In February 2004, this employee was laid off after most of his staff had been downsized in previous years. At the direction of Marmon management, prior to his departure, this manager trained a maintenance employee to assume his duties with the wastewater treatment system. This maintenance employee operated the system until he left for medical reasons at the end of March 2016.

- From at least April 24, 2016, and until September 29, 2016, Marmon had other maintenance employees operating the wastewater treatment system, but they all lacked environmental training and training on the treatment system. Prior to September 29, 2016, these employees did not know, among other things, how to (1) check and maintain the pH probe; (2) operate the sludge filter press; and (3) check and or change the bag filters. They also did not have access to detailed manuals about how to operate the wastewater treatment system.

- These Marmon employees stated to the government that, during this time period, when the storage tank and batch-treatment tank became full and the system was imbalanced, they would empty the tank by opening certain valves to discharge the industrial wastewater without treating it.

- As of mid-October 2016, the 3,000-gallon holding/thickening tank in Marmon's wastewater treatment system still held 1,000 gallons of sludge. By this point, Marmon had stopped operating the sludge filter press routinely.

Based on the foregoing evidence, Marmon and the government agree that Marmon committed the following violations of the Clean Water Act from at least April 24, 2016, through September 29, 2016:

- On every day from at least April 24, 2016, through September 29, 2016, Marmon knowingly failed to properly operate and maintain the industrial wastewater treatment

*David T. Grudberg, Esq.*
*December 21, 2021*
*Page 12*

system and sludge-processing equipment at the Kerite Power Cable & Pump Cable factory located at 49 Day Street in Seymour, Connecticut;

- Marmon knowingly failed to notify CT DEEP promptly of the improper bypass, and that it had stopped processing the sludge using the sludge filter press as required under the Permit's terms; and

- Marmon knowingly exceeded its maximum daily discharge limit in its CT DEEP permit on September 7 and 8, 2016.

This written stipulation is part of the plea agreement. The defendant and the Government reserve their right to present additional offense conduct and relevant conduct to the Court in connection with sentencing.

RANDY CLOS
Vice President of Finance
Marmon Utility LLC
The Defendant

HAROLD H. CHEN
Assistant U.S. Attorney

DAVID T. GRUDBERG, ESQ.
Attorney for the Defendant

David T. Grudberg, Esq.
December 21, 2021
Page 13

## SPECIAL CONDITIONS OF PROBATION — APPENDIX A

**I.**   **General Terms**

Marmon Utility LLC ("the defendant") shall cooperate fully with federal and state environmental officials by complying with all reasonable and lawful requests for inspection, verification, and monitoring of all practices relating to the compliance with environmental laws and the discharge of industrial wastewater at the Kerite Power Cable & Pump Cable ("Kerite") facility at 49 Day Street in Seymour, Connecticut.  The defendant understands that if it sells the Kerite facility to another party, the purchaser or successor-in-interest shall be bound by these Special Conditions of Probation.

**II.**   **Environmental Compliance Program**

The defendant shall submit all evidence of its existing environmental regulatory compliance program to the Probation Office and the United States within 30 days after sentencing. If the defendant does not have an environmental regulatory compliance program, or if, in the judgment of the Probation Office and the government, its existing program is inadequate, the defendant agrees to develop and implement such a program sufficient to satisfy the requirements of U.S.S.G. Chapter 8 concerning effective programs to prevent and detect violations of the law.

**III.**   **Environmental Compliance Audit**

The defendant shall hire an independent outside consultant to perform an environmental audit of its Connecticut facilities.  The defendant shall comply with the following requirements concerning the audit:

A.   It shall retain the consultant within 90 days from the date of sentencing. The consultant will follow generally accepted environmental auditing techniques, procedures, and policies in designing, implementing, and executing the audit, including the reporting of deficiencies and corrective measures.  The audit will cover all applicable regulated environmental matters at the defendant's Connecticut facilities.

B.   Within 120 days from the date of sentencing, the defendant shall have the consultant prepare a final report of its findings and recommendations which the defendant will furnish to the Probation Department and the United States Attorney's Office within 10 days of its receipt of the final report.

C.   The defendant shall submit a written response to the consultant's recommendations to the Probation Office and the United States Attorney's Office no later than 60 days after receiving the consultant's written report. The response

*David T. Grudberg, Esq.*
*December 21, 2021*
*Page 14*

will specify what action the defendant will take to correct any noted deficiencies and regulatory violations.

D.   The defendant shall identify a specific environmental manager for its Connecticut facilities and will ensure that this person has sufficient training, background, and expertise for the job.  The job responsibilities of the environmental manager must include environmental compliance. The defendant's environmental manager must have authority to report noncompliance directly to the defendant's corporate leadership.

## IV.   Resolution of Issues Raised by Connecticut Department of Energy and Environmental Protection in Consent Order No. CO WR IN 17002

Within 120 days of sentencing, the defendant shall resolve with the State of Connecticut, Office of the Attorney General, the issues first raised by the Connecticut Department of Energy and Environmental Protection in Consent Order No. CO WR IN 17002.  The defendant further agrees that the resolution will include payment of a $100,000 civil penalty.

David T. Grudberg, Esq.
December 21, 2021
Page 15

## RIDER CONCERNING RESTITUTION

The Court shall order that the defendant make restitution under 18 U.S.C. § 3663A as follows:

1. If the offense resulted in damage to or loss or destruction of property of a victim of the offense:

   A. Return the property to the owner of the property or someone designated by the owner; or

   B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

   The greater of -
   (I) the value of the property on the date of the damage, loss, or destruction; or

   (II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

2. In the case of an offense resulting in bodily injury to a victim –

   A. Pay an amount equal to the costs of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care; including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

   B. Pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

   C. Reimburse the victim for income lost by such victim as a result of such offense;

3. In the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

4. In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant. In addition to the Court-ordered restitution, the Court may order that the conditions of its order of restitution be made a condition of probation or supervised release. Failure to make restitution as ordered may result in a revocation of probation, 18 U.S.C. § 3565, or a modification of the conditions of supervised release, 18 U.S.C. § 3583(e). Failure to pay restitution may also result in the defendant being held in contempt, or the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. *See* 18 U.S.C. §§ 3613A, 3614.