**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

-----------------------------------------------------------x
                               :

UNITED STATES OF AMERICA        :       CR. NO. 3:21-CR-223 (KAD)
                               :

V.                                        :

MARMON UTILITY LLC             :
                               :

-----------------------------------------------------------x     MARCH 24, 2022

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Marmon Utility LLC ("MU") respectfully submits this memorandum as an aid

to the Court in connection with its upcoming sentencing, scheduled for April 7, 2022 at 11:00

a.m. Defendant pleaded guilty on December 21, 2021 to one count of violating the Clean Water

Act, based on its failure to properly operate and maintain its industrial wastewater treatment

system, in violation of 33 U.S.C. § 1319(c)(2)(A). The parties have entered into a plea

agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), which provides for an agreed resolution of

this matter. As we discuss below, this resolution followed a thorough, extensive government

investigation spanning more than four years, and we urge the Court to impose the sentence set

forth in the plea agreement, which is sufficient, but not greater than necessary, to serve the

statutory goals of sentencing under 18 U.S.C. §§ 3553(a) and 3572.

### I.    BACKGROUND

As noted in the parties' Stipulation of Offense Conduct ("Stipulation") accompanying the

plea agreement, this case focuses on activity at Kerite Power & Pump Cable ("Kerite"), a factory

located in Seymour, Connecticut. The history of Kerite in Seymour dates back to the 19th

century. It is currently a business unit of Marmon Utility, LLC; Marmon Utility is one of many

companies collectively referred to as the "Marmon Group". The Marmon Group acquired Kerite in the late 1990s.

The Marmon Group history traces back to the 1950s and 60s; it is structured as a holding company, and is comprised of dozens of independently-run companies, like MU/Kerite.[1]  The individual companies that comprise the Marmon Group operate independently in their day-to-day operations, with separate management units.  The Kerite facility currently employs roughly 100 individuals.

Kerite's main products are medium- and high-voltage insulated electrical cable, typically used in underground, undersea, or aerial applications.  The principal insulation material for the cable is vulcanized rubber.  The process by which the rubber insulation compounds are applied to metal wire involves "continuous vulcanization" (better known as "CV").  During this process, both pressurized steam and cooling water are used to achieve the desired result with the rubber insulation (i.e., vulcanization).  The CV process water flows at approximately 3 gallons per minute.  It is looped, and recycled, through the manufacturing system; when the volume reaches a certain level, the system is programmed to transfer "process water" to the Wastewater Storage Tank that is part of the treatment system at issue in this case.  Water can also be automatically transferred back to the "process" side of the operation, depending on volume levels in that part of the system.

The steam and cold water used in vulcanization is generally clean, but does ultimately have traces of metals – principally lead and zinc.

---

[1]  The Stipulation notes that Marmon Group is owned by Berkshire Hathaway.  Berkshire first acquired a 60 per cent ownership stake in the Marmon Group in 2007, and over the next 6 years purchased the remaining ownership stake.

In the early 2000s, the Connecticut Department of Energy and Environmental ("CT DEEP" – then known as "DEP") directed Kerite to install a pre-treatment system for treatment of its CV process wastewater before discharge. Kerite fully cooperated and complied; it engaged a multi-state company with decades of experience in the design and installation of wastewater treatment systems, to provide the system. The system began operation in 2002. As noted in the Stipulation, the pretreatment system is designed to precipitate metals out of the wastewater accumulated in the storage tank. Treated, clean wastewater is then discharged to the sanitary sewer, and metals/sludge that has been removed from the wastewater is ultimately transferred to storage drums, for disposal off-site. Kerite has been considered a "small-quantity" generator of waste.

The Kerite wastewater treatment system is operated pursuant to a Pretreatment Permit issued by CT DEEP, allowing discharge to the municipal sanitary sewer system, also referred to as the Publicly Owned Treatment Works ("POTW"). The permit provides, among other things, limits on the volume of wastewater that may be discharged in a given period of time, and limits on the amount of metals that may be present in any wastewater. It also establishes procedures that must be followed in the event of a violation. See generally Stipulation, Plea Agreement p.9.

## II.    THE OFFENSE CONDUCT AND RESPONSE

The sequence of events that brings MU before the Court began in the spring of 2016. At that time, the individual at Kerite who for many years had primary responsibility for the operation of the wastewater treatment system suffered a serious medical problem, which caused him to be out of work indefinitely. In general, the treatment system was required to be run 4-5 times per month, though the volume of the wastewater storage tank (and thus the frequency of treatment cycles) would vary depending on production volume. Following the medical

emergency, several other employees in the same department assumed the responsibilities of the primary operator. MU has admitted, as part of its guilty plea, that these employees had not been properly trained to operate the treatment system, and were not familiar with all aspects of its operation, including sludge disposal. As a result, from at least April 24, 2016 to late September of that year, the company failed to operate and maintain the treatment system and related sludge processing equipment at Kerite as required. In addition, Kerite exceeded the allowable limits of its discharge permit on September 7-8, 2016, and failed to report the exceedances to CT DEEP in a timely manner. (During the September 7-8 period, the individual who had assumed primary responsibility for the wastewater treatment duties of the longtime employee who had fallen ill in the spring was himself away on vacation). Collectively, these failures violated the terms of the company's wastewater discharge permit. See generally, Stipulation, Plea Agreement pp.10-12. MU has accepted full responsibility for these failures in its plea of guilty.

CT DEEP conducted an inspection at Kerite in late September 2016, and thereafter issued administrative Notices of Violation. After issues were called to Kerite's attention, the company moved quickly to remedy them, with the cooperation of the State and with assistance of qualified private vendors, and generally to improve its treatment system. The company reached out to the company that had installed the original treatment system – which was unchanged from its original design – to educate Kerite personnel about proper operation of the system, and to remedy any problems that had arisen with accumulated sludge. It also enlisted its long-time environmental consultant to help implement changes to the treatment system which would reduce or eliminate the possibility for sludge discharges from the system; these proposed changes were approved by DEEP in the fall of 2016, and thereafter implemented with the assistance of the original system designer.

{N5833432}                                    4

A short time later, the environmental consultant conducted formal training of relevant Kerite personnel on the proper operation of the wastewater treatment system. The company also revised its operations manual for the treatment system, again with the prior approval of CT DEEP. A new, updated operations manual was approved and put into use in the early part of 2017. All of these changes were made by the company before it had any knowledge of a criminal investigation; the initial grand jury subpoena in this matter was not served on MU until April 2017.

CT DEEP officials have inspected the company regularly in the nearly 5 years since these changes were made. Subsequent improvements to the system – also designed to further eliminate the possibility of future problems – have been proposed by the company, approved by DEEP, and implemented. No problems have arisen with the system since the 2016 period in question, and CT DEEP has offered positive feedback about the remedial measures taken following the 2016 issues.

## III.   GENERAL HISTORY OF ENVIRONMENTAL COMMITMENT AND COMPLIANCE

As noted, MU made significant mistakes in the operation of the Kerite wastewater treatment system in 2016, following the departure of a key employee; it has accepted full responsibility for those mistakes, and has agreed to a substantial penalty for them. In our view, however, these failings were an aberration; the company has a track record of attempting to do things "the right way", even though mistakes have been made. We believe this historical information will assist the Court in its decision whether to accept the parties' agreed disposition.

For many years, both before and after the 2016 issues, MU/Kerite has relied on Loureiro Engineering Associates ("LEA"), a qualified, experienced firm, to lead its environmental compliance tasks, including training. LEA has provided its expert guidance not only with

respect to the CV wastewater treatment system, but in other facets of the company's production and environmental compliance. We do not believe there is any dispute that LEA was, and is, an appropriate entity to serve that role. The outsourcing of environmental compliance work is appropriate, and is evidence of a commitment to compliance.

MU/Kerite also has a substantial and consistent record of capital improvements, both to its treatment system, and on general environmental issues. The most pertinent example to the facts of this case is the installation of a brand new deep-bed gravity filter in early 2013. The unit was installed on the "process" side of the CV water "loop", i.e., the flow of water between the CV process lines and the wastewater treatment system. A deep-bed filter separates solids from liquids by allowing the liquid to percolate through a synthetic cloth material, retaining suspended solids on the cloth. The practical effect of this physical process is to remove solids upstream of the chemical precipitation that occurs during the wastewater treatment process, thereby reducing the amount of metal in the process wastewater, and ultimately the amount of sludge produced. The cost to acquire and install this new, high-end unit was over $70,000.

In a similar vein, in February 2007 MU/Kerite installed a closed-loop cooling system for its lead extrusion cable jacketing process, and another in July 2008 for a rubber extruder process. The cumulative effect of these system improvements was to reduce substantially the use of water, and wastewater flows, from the Kerite plant. The water flow decreased by approximately 30,000 to 40,000 gallons per day (gpd).

We made the government aware of this history during the course of the investigation of this matter, and believe the company's track record in this regard has been appropriately taken into account in the proposed Rule 11(c)(1)(C) disposition before the Court.

IV.   **THE PLEA AGREEMENT IS A FAIR RESOLUTION
OF THE CONDUCT AT ISSUE**

The key components of the agreed disposition in this case are as follows:

-      MU will pay a criminal fine of $800,000 within 30 days of sentencing;

-      On or before the date of sentencing, MU will make a $1.6 million community service

payment to the Connecticut Statewide Supplemental Environmental Project ("SEP") Account,

which is managed by CT DEEP.  The payment will be used to fund various ecosystem projects in

the Naugatuck River Basin, at DEEP's discretion.  Defendant will not claim, or receive, any tax

benefit as a result of this payment;

-      MU will be placed on probation for a period of three years, and will comply with various

Special Conditions, including 1) an examination and/or overhaul of its environmental

compliance program; 2) a thorough environmental compliance audit, including implementation

of outside consultant recommendations, and designation of an "environmental manager" for

Connecticut facilities, with appropriate authority to report to upper management, and 3)

resolution of an outstanding consent order with DEEP, which will include payment of a

$100,000 civil penalty.

See generally Plea Agreement, pp. 3-4, 13-14.  The total financial consequence to the defendant

as a result of the proposed disposition will be $2.5 million (exclusive of restitution and any costs

incurred in compliance with Special Conditions of Probation).

The Court is fully familiar with the general requirement under 18 U.S.C. § 3553(a) that

any criminal sentence imposed be "sufficient, but not greater than necessary" to achieve the

statutory goals of sentencing set forth in that section.  Because the proposed disposition in this

case involves a fine and other related financial requirements, Section 3572 of Title 18 also comes

into play.  Section 3572 provides as follows:

**(a) Factors to be considered.**--In determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine, the court shall consider, in addition to the factors set forth in section 3553(a)—

**(1)** the defendant's income, earning capacity, and financial resources;

**(2)** the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;

**(3)** any pecuniary loss inflicted upon others as a result of the offense;

**(4)** whether restitution is ordered or made and the amount of such restitution;

**(5)** the need to deprive the defendant of illegally obtained gains from the offense;

**(6)** the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence;

**(7)** whether the defendant can pass on to consumers or other persons the expense of the fine; and

**(8)** if the defendant is an organization, the size of the organization and any measure taken by the organization to discipline any officer, director, employee, or agent of the organization responsible for the offense and to prevent a recurrence of such an offense.

18 U.S.C. § 3572.

There are very few published decisions, particularly in this Circuit, addressing the application of Section 3572. Most involve defendants attempting to avoid, or reduce, the amount of a fine imposed by the court. See, e.g., U.S. v. Ionia Management SA, 537 F. Supp. 2d 321 (D. Conn. 2008), aff'd, 555 F.3d 303 (2d Cir. 2009) (corporation convicted of marine pollution violations challenged fine imposed by district court, and moved to modify; sentence affirmed on appeal without discussion of individual Section 3572 factors).

We respectfully submit that the proposed disposition, under which defendant has agreed to a multi-million dollar financial obligation, is an appropriate sanction under the circumstances of this case, and "sufficient, but not greater than necessary" to achieve the purposes of

sentencing. As to the first two Section 3572 factors, which deal with a defendant's finances and the potential burden of any fine, the Court should be aware that the amount of financial sanction was a topic of considerable discussion and negotiation between the parties prior to the plea agreement. The government's position was informed by extensive financial records relating to Kerite that the government had requested via grand jury subpoena, and which were produced by the company.[2] Put simply, the government had the benefit of the full picture of defendant's financial history and present finances, and in our view would not have agreed to the proposed financial disposition if it did not believe it was appropriate based on the information before it.

Factors (3)-(5) deal with pecuniary loss, restitution, and possible deprivation of ill-gotten gains. Here, there is no issue of "illegally obtained gains"; defendant has agreed to make restitution to Veolia North America, operator of the Seymour POTW of $7,358, to reimburse for costs incurred following the September 7-8, 2016 discharges.

Sections (6) is addressed to imprisonment, and is not relevant in this corporate prosecution.

Section (8) is specifically addressed to organizational defendants. It focuses both on "discipline" and on measures taken to "prevent a recurrence" of the offense. As noted, the failings in this case were primarily by lower-level employees, who had not been properly trained before being pressed into service to fill in for a colleague who had suffered a serious medical event.[3] MU has acknowledged its errors in this regard and has taken significant "measure[s] . . . to prevent a recurrence" of the offense.

---

[2]  If the Court wishes, defendant will submit this production for in camera review by the Court – or file under seal.

[3]  The offense of conviction is a "knowing" violation of the Clean Water Act; however, proof that one intended to violate the law is not required under this statute, merely that the acts in question were undertaken with knowledge, rather than accidentally. We believe the

Finally, the agreed financial sanction is generally consistent with prior Clean Water Act cases in the District of Connecticut.  For instance, in U.S. v. Conopco, Inc. dba Unilever, Dkt. No.3:13-CR-0223 (RNC), the defendant company was responsible for repeated improper discharges over a two-year period.  Company employees bypassed its treatment system on a weekly basis, and discharged inadequately treated wastewater, in approximately 1500-gallon batches, directly through a storm drain to a local creek.  (The total volume of the polluted discharge, based on the facts set forth in the parties' plea agreement, would be approximately 150,000 gallons.)

Unilever also admitted to incorrectly characterizing one such discharge – in December 2008, toward the end of the relevant course of conduct - as a "one-off", or isolated incident; the government's subsequent investigation revealed the repeated bypasses noted above, dating back roughly two years.  Two months later, in February 2009, a sample taken by DEEP from a Unilever filtrate tank at the same site revealed fecal coliform levels far above the Company's permit.  Unilever further admitted in its plea that it had been aware of substantial problems with the system, and its operators, but had not taken appropriate steps to address those problems.

Unilever was sentenced to pay a $1 million criminal fine, and made a required contribution of $3.5 million to the Connecticut Statewide SEP fund.  That case, in our view, involved far more extensive and egregious misconduct that the conduct at issue in this case.

The case of U.S. v. Thomas Faria/Sheffield Pharmaceuticals, 3:14-CR-149 (AWT), also involved far more troubling conduct - and a substantially lower financial sanction.  For a period of 25 years, from 1986 to 2011, Sheffield discharged untreated industrial wastewater to the New

---

government's investigation established that the employees in question were well-meaning, but inadequately trained for the environmental responsibilities and tasks they were called upon to carry out.

{N5833432}                                    10

London POTW, without a permit and in violation of Connecticut law. Thomas Faria succeeded his father in April 2003 as president and CEO of the company. Shortly thereafter, he learned that Sheffield was discharging, as part of its industrial wastewater, pollutants considered toxic under federal law. He also learned that, in order to obtain a proper permit from CT DEEP, the company would have to install a costly wastewater pretreatment treatment system. Several employees urged him to make the investment, as did four environmental consulting firms, who also advised that the unpermitted discharge was illegal. Nevertheless, Faria declined to seek a permit or install a treatment system.

Sheffield continued its untreated, and unpermitted, discharges until 2011, when violations were discovered by DEEP authorities.

Mr. Faria was sentenced to a 3-year term of probation, and a $30,000 fine. Sheffield entered into a deferred prosecution agreement with the government, and agreed to pay $1 million toward environmental conservation projects in coastal Connecticut.

In this case, both sides agree that the plea and agreed sentence are a fair resolution of the conduct at issue. The agreed disposition appropriately balances the company's mistakes with its prior record, its response following the discovery of its errors, its cooperation with the government during the course of the investigation, and its commitment to continued future improvements.

## **CONCLUSION**

For the foregoing reasons, Marmon Utility respectfully requests that the Court accept the

parties' proposed plea agreement, and impose sentence accordingly.




THE DEFENDANT,
MARMOM UTILITY LLC


By: /s/ David T. Grudberg
  David T. Grudberg (ct01186)
  CARMODY TORRANCE SANDAK &
  HENNESSEY LLP
  195 Church Street
  P.O. Box 1950
  New Haven, CT 06510
  Tel.:(203) 777-5501
  Fax: (203) 784-3199
  E-mail: dgrudberg@carmodylaw.com

{N5833432}

## **CERTIFICATION**

I hereby certify that on this 24th day of March, 2022, a copy of the foregoing Memorandum in Aid of Sentencing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing.

/s/ David T. Grudberg
David T. Grudberg