UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 3:21CR223(KAD) |
| MARMON UTILITY LLC | : | March 31, 2022 |

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

Promulgated in 1972, the federal Clean Water Act ("CWA") seeks "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" for the American people.  33 U.S.C. § 1251(a).  To that end, the CWA and its related regulations require manufacturing companies to use wastewater treatment systems at their factories to remove heavy metals, such as lead and zinc, to acceptable levels before discharging industrial wastewater to municipal sewage treatment plants, which are designed primarily to treat human biological waste.  From the sewage treatment plant, the treated water flows out to rivers, lakes, and streams. Heavy metals can remain in public bodies of water if their concentrations were not adequately reduced at the factory level.

This prosecution represents a sad instance in which a profitable manufacturing company in Connecticut effectively chose, to the public's detriment, not to commit adequate resources and devote sufficient attention to fulfilling its environmental obligations under the CWA.  In a written plea agreement, Marmon Utility LLC ("Marmon"), whose ultimate parent company is Berkshire Hathaway, has admitted that on each day from at least April 24, 2016, to September 29, 2016, it failed to properly operate and maintain the facilities and systems for industrial wastewater collection, storage, treatment, and control at the Kerite Power Cable & Pump Cable

1

("Kerite") factory located at 49 Day Street in Seymour, Connecticut.  As a result of its parsimony and inattention, Marmon released thousands of gallons of untreated factory wastewater containing heavy metals to the Seymour municipal sewage treatment plant, which flows out to the Naugatuck River.  It likely would have been more cost-effective for Marmon to maintain a robust environmental compliance program rather than to cut corners and risk federal prosecution.

As discussed more fully below, the Government's investigation with the Environmental Protection Agency ("EPA") and the Connecticut Department of Energy and Environmental Protection ("CT DEEP") proved, among other things, (1) that on September 7 and 8, 2016, rusty brown wastewater from the Kerite factory flowed into the Seymour treatment plant and interfered with the plant's ability to treat sewage; (2) that this large inflow of rusty brown wastewater caused the plant's influent to have a lead concentration 127 times greater than its normal lead measurement and a zinc concentration 10 times greater than the plant's normal zinc concentration; and (3) that several truckloads of biologic microorganisms had to be added into the treatment plant tanks to break down the unprocessed sewage.  It took two weeks to get the Seymour treatment plant fully back on-line.

The grand jury investigation further revealed that (1) Kerite's dedicated environmental manager had been downsized in 2004 not long after Marmon purchased the factory; (2) Kerite's wastewater treatment operator had not been on-site since the end of March 2016; (3) that until September 29, 2016, Kerite had cobbled together a group of untrained maintenance employees with no environmental background to run the sophisticated treatment system designed to precipitate out lead and zinc in a metallic sludge; (4) that during this period, these Kerite maintenance employees would send untreated factory wastewater to the sewage treatment plant without reducing the lead and zinc content as required; and (5) an inspection in late September

2

2016 showed that the sludge had not been processed properly and Kerite's wastewater treatment system tanks contained unacceptably large amounts of heavy metal sludge.

At sentencing, the Government respectfully asks the Court to accept Marmon's guilty plea pursuant to Fed. R. Crim. P. 11(c)(l)(C).  Per the plea agreement, Marmon has agreed to comply with the following provisions, among others: (1) pay a criminal fine of $800,000 within 30 days of sentencing; (2) serve a three-year period of probation subject to Special Conditions of Probation in Appendix A of the plea agreement, including the resolution of an outstanding state civil matter with the State of Connecticut, Office of the Attorney General, involving a $100,000 civil penalty; and (3) make a $1.6 million non-tax deductible community service payment to the Connecticut Statewide Supplemental Environmental Project ("SEP") Account managed by the Connecticut Department of Energy and Environmental Protection ("CT DEEP") to improve and enhance the Naugatuck River Basin.

This resolution properly reflects the seriousness of Marmon's offense, provides just punishment for its conduct, achieves specific and general deterrence, and promotes respect for the law pursuant to 18 U.S.C. § 3553(a).  In addition, the $800,000 fine is consistent with the dictates of 18 U.S.C. § 3572(a) and prior environmental prosecutions in this District.  The $1.6 million community service payment will enable CT DEEP to substantially improve the Naugatuck River, which was the body of water most affected by Marmon's criminal conduct. Finally, Marmon must make restitution of $7,538 to Veolia North America, the operator of the Seymour wastewater treatment facility.

I.      **THE OFFENSE AND RELEVANT CONDUCT**

The following summary is drawn primarily from Marmon's plea agreement entered in open court on December 21, 2021 [doc. 4].

A.      **Marmon Utility LLC and Kerite Power Cable & Pump Cable**

Marmon Utility LLC ("Marmon"), owns Kerite Power Cable & Pump Cable ("Kerite"), which operates a factory located at 49 Day Street in Seymour, Connecticut.  Marmon is owned by Marmon Group, a holding company that purchased Kerite in 1999.  Marmon Group is owned by Berkshire Hathaway.

At its Kerite factory in Seymour, Marmon manufactures large rubber-insulated power cable used for, among other industrial purposes, the transmission of high-voltage electricity in harsh marine environments across long distances.  To make the cable, rubber compounds are extruded over metal wires, thereby forming insulated layers around the metal to protect them from the elements.  This manufacturing process generates industrial wastewater containing heavy metals such as lead, zinc, and copper.

B.      **The Role of the Connecticut Department of Energy and Environmental Protection in Enforcing the Clean Water Act**

Under the CWA and related federal and state regulations, a manufacturing company in Connecticut must have a permit from the Connecticut Department of Energy and Environmental Protection ("CT DEEP") to lawfully discharge industrial wastewater to a municipal sewage treatment plant, which is also known as the Publicly Owned Treatment Works ("POTW").  This requirement exists because a sewage treatment plant is primarily designed to treat human

biological waste—not the pollutants or chemicals present in industrial wastewater.  Moreover, the water exiting a treatment plant is ultimately discharged to rivers, lakes, and the sea.

Consequently, CT DEEP permits regulate the amount of industrial wastewater discharged to the sewage treatment plant and require manufacturing companies to "pretreat" their industrial wastewater at the factory to remove heavy metals, such as lead and zinc.  Such permits also prohibit bypassing any portion of the treatment system, and require companies to properly operate and maintain the system, in addition to imposing limits on the amounts of heavy metals that can be sent to the sewage treatment plant.

### C.  The Town of Seymour's Municipal Sewage Treatment Plant

The Town of Seymour's municipal sewage treatment plant is located at 723 Derby Avenue Extension and has its own CT DEEP permit to treat and discharge wastewater.  For all times relevant to this case, a company named Veolia Water North America operated Seymour's sewage treatment plant.  After the sewage is processed, the plant discharges the treated wastewater to the Naugatuck River, which merges with the Housatonic River in Derby, Connecticut, which flows south and empties into the Long Island Sound.  The Seymour Water Pollution Control Authority oversees the plant.

### D.  Marmon's Industrial Wastewater Treatment System at the Kerite Factory in Seymour, Connecticut

Under its CT DEEP permit issued on April 29, 2015, Marmon was required to properly operate and maintain the industrial wastewater treatment system at its Kerite factory, including pretreating the industrial wastewater; reducing the levels of heavy metals, primarily lead and zinc, before discharge; and prohibiting bypasses of any portion of the treatment system.  In its most basic terms, Marmon's pretreatment system runs its industrial wastewater through a series of tanks and pipes to remove heavy metals by chemical precipitation.  The pretreatment process

5

begins in a 7,500-gallon storage tank, which pipes the wastewater to a 6,000-gallon batch-treatment tank.  At specific times, an operator must add chemicals to this batch treatment tank which, at the proper pH levels, will precipitate the metals out of the wastewater and generate a metals-bearing sludge sinking to the tank's bottom. An operator transfers the sludge through a pipe to a 3,000-gallon holding/thickening tank, where it thickens and is transferred to a filter press to remove the remaining moisture.  An operator then discharges the treated industrial wastewater to a 300-gallon holding/discharge tank where it is sent through bag filters to capture any remaining solids.  From this point, the industrial wastewater has completed the pretreatment process and can be discharged safely to the sewage treatment plant.  An operator has to transfer the metals-bearing sludge into chemical storage drums, which are trucked offsite by a licensed waste disposal service.

### E.  The Disruption at the Seymour Treatment Plant and Subsequent CT DEEP Investigation in September 2016

On September 7 and 8, 2016, the Veolia superintendent of the Seymour treatment plant observed unusual, rusty brown wastewater flowing into the plant and notified CT DEEP.  This rusty brown influent was interfering with the plant's ability to treat the sewage.  The Veolia superintendent took samples of the rusty brown influent and determined that its lead concentration was approximately 127 times greater than the plant's normal lead measurement (1.79 mg vs. .014 mg), and that its zinc concentration was over 10 times the typical zinc concentration (1.69 mg vs. .163 mg).  As a result, during the next several days, Veolia had to order several truckloads of biologic microorganisms to break down the unprocessed sewage.  It took two weeks for the treatment plant to return to usual operational capacity.  Based on the

sampling performed by Seymour treatment plant, the plant reported that it did not exceed the limits in its discharge permit.

On September 27 and 29, 2016, CT DEEP and Veolia inspected Marmon's Kerite facility and concluded that it had discharged the rusty brown influent with the high lead and zinc concentrations on September 7, 8, and 9, 2016.  CT DEEP issued a Notice of Violation to Marmon, with four key findings.  First, the Marmon facility manager at the Kerite factory told CT DEEP, among other things: (1) that the wastewater treatment operator had not been at the facility since the end of March 2016 due to medical reasons; (2) that no sludge had been processed in the filter press since this employee's departure; and (3) no other Marmon employee had been trained to process sludge as required under the CT DEEP permit.

Second, the Kerite factory had discharged 5,725 gallons of industrial wastewater on September 7, 2016, and 5,225 gallons on September 8, 2016.  These discharge amounts exceeded the 4,900 maximum daily discharge limit in Marmon's CT DEEP permit.

Third, the batch-treatment tank, the sludge-holding tank, and the final discharge tank all contained large amounts of sludge.  The water in the final discharge tank, which holds "clean" water and should not contain sludge, flows directly to the Seymour sewage treatment plant.

Fourth, the lead concentration in water samples taken from the final discharge tank was 69 times greater than the limits of Marmon's CT DEEP permit (20.7 mg/l vs. limit of .3 mg/l). The zinc concentration in water samples taken from the final discharge tank was 8.5 times greater than the limits of Marmon's CT DEEP permit (17.1 mg/l vs. limit of 2.0 mg/l).

## F.  **The Government's Grand Jury Investigation**

The Government's grand jury investigation of Marmon further determined that beginning in 1989, the Kerite factory had employed a Facilities and Environmental Manager with an environmental compliance background to operate the wastewater treatment system and the

sludge filter press.  In February 2004, not long after Marmon had acquired Kerite, this manager was laid off after most of his staff had been downsized in previous years.  At the direction of Marmon management, prior to his departure, this manager trained a maintenance employee to assume his duties with the wastewater treatment system.  This maintenance employee operated the system until he left for medical reasons at the end of March 2016.

In addition, the grand jury investigation uncovered that from at least April 24, 2016, and until September 29, 2016, Marmon had other maintenance employees operating the wastewater treatment system, but they all lacked environmental training and training on the treatment system.  Prior to September 29, 2016, these employees did not know, among other things, how to (1) check and maintain the pH probe; (2) operate the sludge filter press; and (3) check and or change the bag filters. They also did not have access to detailed manuals for operating the wastewater treatment system.

Most significantly, the Marmon employees stated that, during this time period, when the storage tank and batch-treatment tank became full and the system was imbalanced, they would empty the tank by opening certain valves to discharge the industrial wastewater without treating it.  At times, they improperly opened certain valves, thereby allowing untreated industrial wastewater to flow out to the Seymour sewage treatment plant.  Thus, instead of removing the lead and zinc, Marmon employees discharged untreated wastewater containing these heavy metals to the sewage treatment plant.

Further proof of Marmon's violation of the CWA was evident in its mismanagement of the sludge containing lead and zinc.  As of mid-October 2016, the 3,000-gallon

holding/thickening tank in Marmon's wastewater treatment system still held 1,000 gallons of sludge.  By this point, Marmon had stopped operating the sludge filter press routinely.[1]

### G. Marmon's Admission That It Violated the Clean Water Act From at Least April 24, 2016, Through September 29, 2016

Based on the above discussion, Marmon admitted in its plea agreement that from at least April 24, 2016, through September 29, 2016, it had knowingly failed to properly operate and maintain the industrial wastewater treatment system and sludge-processing equipment at the Kerite factory in Seymour, Connecticut; knowingly failed to notify CT DEEP promptly of the improper bypass, and that it had stopped processing the sludge using the sludge filter press as required under the Permit's terms; and  knowingly exceeded its maximum daily discharge limit in its CT DEEP permit on September 7 and 8, 2016, in violation of 33 U.S.C. § 1319(c)(2)(A).

## II.    THE PLEA AGREEMENT PURSUANT TO FED. R. CRIM. P. 11(c)(1)(C)

On December 21, 2021, Marmon pleaded guilty to knowingly violating, or causing a violation of, the requirements imposed in a pretreatment program approved under the CWA by failing to properly operate and maintain its industrial wastewater treatment system at the Seymour Kerite factory in violation of 33 U.S.C. § 1319(c)(2)(A) on each day from at least April 24, 2016, to September 29, 2016.  In Marmon's written plea agreement under Fed. R. Crim. P. 11(c)(1)(C), the parties agreed that sentence below is sufficient, but not greater than necessary, to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a):

---

[1] The Government further notes that as early as May 2002, CT DEEP had identified a problematic bypass valve with Marmon's wastewater treatment system that would enable an operator to allow sludge to flow from the sludge thickening tank to the final discharge tank. After receiving a CT DEEP violation notice in 2017, Marmon removed this bypass valve and related piping.

(1) the defendant shall pay a criminal fine of $800,000 payable to the Clerk of the Court within 30 days of sentencing;

(2) the defendant shall be placed on probation for a period of three years from the date of sentencing, during which time the defendant shall comply with the Special Conditions of Probation set forth in Appendix A of this Plea Agreement, which shall become part of the Court's Judgment; and

(3) on or before the date of sentencing, the defendant shall make a $1.6 million community service payment to the Connecticut Statewide Supplemental Environmental Project ("SEP") Account (Naugatuck River Enhancement), managed by the Connecticut Department of Energy and Environmental Protection ("CT DEEP"). This payment shall be used to fund aquatic ecosystem enhancement projects in the Naugatuck River Basin as selected by CT DEEP consistent with its February 15, 1996, *Policy on Supplemental Environmental Projects*, and in accordance with its *Environmental Equity Policy*, including, but not limited to, river restoration, water quality improvement, dam removal, fish habitat enhancement, sediment removal, and stream bank stabilization.

Plea Agreement [doc.4] at 3.

The Special Terms of Probation require Marmon to cooperate fully with federal and state environmental officials and comply with all reasonable and lawful requests for inspection, verification, and monitoring of environmental compliance, including the discharge of industrial wastewater at the Kerite factory. Marmon also must provide evidence of its existing environmental regulatory compliance program to the Probation Office and the government within 30 days after sentencing, and hire an independent outside consultant to perform an environmental audit of its Connecticut facilities within 90 days of sentencing. Significantly, due to the lack of on-site environmental expertise when the illegal discharges occurred, Marmon must designate a qualified environmental manager in charge of environmental compliance for its Connecticut facilities with authority to report noncompliance directly to the defendant's corporate leadership. Finally, Marmon agrees to resolve an outstanding civil matter with the State of Connecticut, Office of the Attorney General, including the payment of a $100,000 civil penalty. *Id*. at 13-14.

10

III.  **THE AGREED-UPON SENTENCE WOULD ACHIEVE JUST PUNISHMENT, SPECIFIC AND GENERAL DETERRENCE, AND PROMOTE RESPECT FOR THE CLEAN WATER ACT**

A.  **Legal Standard and 18 U.S.C. § 3553(a)**

Although the Sentencing Guidelines are no longer mandatory, they must be considered by the Court along with the other factors listed in 18 U.S.C. § 3553(a).  *United States v. Booker*, 543 U.S. 220, 260-61 (2005); *United States v. Caracappa*, 614 F.3d 30, 44 (2d Cir. 2010). Ultimately, a district court's sentence is reviewed for reasonableness.  *Booker*, 543 U.S. at 260-61.  Reasonableness is a flexible concept, and district courts are given latitude in their exercise of discretion to fashion an appropriate sentence, even a non-Guidelines sentence.  *See Caracappa*, 614 F.3d at 44.  The Second Circuit Court of Appeals ("Second Circuit") has recognized that "[i]n calibrating [its] review for reasonableness, [it] will continue to seek guidance from the considered judgment of the Sentencing Commission as expressed in the Sentencing Guidelines and authorized by Congress."  *United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006).

Title 18, United States Code, Section 3553(a) provides, in pertinent part:

> (a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed–
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and

11

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> ***
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and
>
> (7) the need to provide restitution to any victims of the offense.

### B.    Discussion of Marmon's Clean Water Act Violation

Marmon committed a serious criminal violation of the Clean Water Act by not properly operating its wastewater treatment system and not adequately training its personnel at its Kerite factory.  This institutional failure came to a head on September 7 and 8, 2016, when Kerite's wastewater with high levels of lead and zinc disrupted the Seymour water treatment plant, causing the plant to take extreme measures to remain operational.  A subsequent CT DEEP inspection later showed that the sludge had not been processed properly at the Kerite factory and its wastewater treatment system tanks contained unacceptably large amounts of sludge.

With the potential risk of heavy metals seeping into public waterways, it was unacceptable for Marmon to rely on untrained maintenance employees to operate a sophisticated wastewater treatment system on an *ad hoc* basis.  Due to their lack of training, the Kerite workers did not understand how to precipitate out the lead and zinc from the wastewater, how to check and maintain the pH probe, how to operate the sludge filter press, and how to change the bag filters.[2]  They did not even have access to the system's operational manuals.  These Kerite

---

[2] To the extent that Marmon relied on an outside contractor, Loureiro Engineering Associates ("LEA"), to comply with its obligations under the Clean Water Act, the factual record makes clear that neither Marmon nor LEA exercised sufficient day-to-day supervision of Kerite's wastewater treatment system or the workers to prevent the offense conduct giving rise to this prosecution.  Notably, Marmon has not indicated the number of hours spent by LEA personnel on-site to oversee the operation of Kerite's wastewater treatment system and train

maintenance employees were essentially put in a position to fail.  As a result, when the system

became imbalanced, these employees would empty the tank and discharge the industrial

wastewater without ever treating it.  In sum, the evidence demonstrates that Marmon committed

a serious criminal violation of the CWA, and should be punished accordingly and deterred from

reoffending in the future.

C.    **The Proposed Sentence Will Promote General Deterrence and Foster Respect for the Law**

The Government agrees with Marmon that the sentence set forth in the plea agreement

achieves the objectives set forth in 18 U.S.C. §§ 3553(a) and 3572(a).  The stipulated sentence in

the plea agreement imposes an $800,000 penalty that is commensurate with Marmon's CWA

violation and appropriately reflects the duration and severity of the offense conduct.[3]

Moreover, the agreed-upon sentence shall promote general deterrence and foster respect

for the CWA.  A key factor that the Court must consider in imposing sentence is the need for the

sentence to "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).  The

CWA, like other environmental statutes, relies largely on self-policing by the regulated

community.  In Connecticut, a company seeking to discharge industrial wastewater to a sewage

treatment plant must complete a detailed permit application that fully describes the process from

which the wastewater is generated; the treatment system that will be used to pretreat the

---

Kerite employees to operate it, particularly in 2016.

[3] The instant proposed resolution is consistent with recent criminal environmental sentences imposed in this District pursuant to Fed. R. Crim. P. 11(c)(1)(C).  *See United States v. SCP Management, LLC*, Case No. 3:17CR19(SRU) (Clean Air Act prosecution requiring defendant to pay $200,000 fine and $200,000 community service payment); *United States v. Conopco, Inc., dba Unilever Home and Personal Care USA*, Case No. 3:13-CR-0223 (RNC) (CWA prosecution involving company's knowing discharge of industrial wastewater directly into freshwater creek and requiring defendant to pay $1 million fine and $3.5 million community service payment).

wastewater; and the location, frequency, and pollutant characteristics of the discharge itself.  In a very real sense, Connecticut's system of protecting water quality depends upon companies being willing to play by the rules.  The stipulated sentence, particularly the significant financial costs imposed upon Marmon and the special terms of probation, will foster deterrence from other similarly situated companies in Connecticut and promote respect for the law.

    **D.**       <u>**The Proposed Sentence Will Directly Enhance the Naugatuck River**</u>

Finally, the $1.6 million community service payment by Marmon will directly enhance the Naugatuck River.  The Court may order community service as a discretionary condition of probation pursuant to 18 U.S.C. § 3563(b) to the extent the community service is "reasonably related" to the factors set forth in section 3553(a)(l) and (a)(2).  Similarly, section 8Bl.3 of the Sentencing Guidelines authorizes imposition of community service as a probationary condition when it is "reasonably designed to repair the harm caused by the offense."  USSG § 8B1.3.  Here, the benefit conferred by the proposed community service payment of $1.6 million will directly flow to the Naugatuck River, the actual body of water most affected by Marmon's criminal conduct.  As specified in the plea agreement, these funds will be used by CT DEEP to address river restoration, water quality improvement, dam removal, fish habitat enhancement, sediment removal, and stream bank stabilization.  *See* Plea Agreement [doc.4] at 3.  Such community service payment would be fully consonant with the dictates of 18 U.S.C. § 3563(b) and U.S.S.G. § 8B1.3.

## <u>CONCLUSION</u>

The Government respectfully requests the Court to sentence Marmon pursuant to the stipulated sentence in the plea agreement.

Respectfully submitted,

LEONARD C BOYLE
UNITED STATES ATTORNEY

/s/ Harold H. Chen

HAROLD H. CHEN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT24432
1000 LAFAYETTE BLVD., 10th FLOOR
BRIDGEPORT, CONNECTICUT 06604
(203) 696-3000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 31, 2021, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/

HAROLD H. CHEN
ASSISTANT UNITED STATES ATTORNEY